# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATASHA EMBRY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 3685 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Natasha Embry, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§432(d)(2); 1314(a)(3)(A), 216(l) and 223(d)(2). Ms. Embry asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Embry applied for SSI and DIB on December 31, 2009, alleging that she became disabled on September 30, 2009, due to Moyamoya syndrome. (Administrative Record ("R.") 116-118, 155). Ms. Embry's claims were denied initially on May 11, 2010, and upon reconsideration on November 4, 2010. (R. 58-62, 67-70, 72-75). An administrative law judge ("ALJ") held a hearing on September 8, 2011, at which Ms. Embry, represented by counsel, appeared and testified. Leanne Kehr, an impartial vocational expert ("VE"), also appeared and testified. (R. 3-53).

On November 15, 2011, the ALJ issued a decision finding Ms. Embry not disabled, because her impairments did not prevent her from performing a restricted range of sedentary work. (R. 16-24). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Embry's request for review of on March 29, 2012. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Embry has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Embry was born on April 26, 1979, making her thirty-two years old at the time of the ALJ's decision (R. 33, 156). At the time of the ALJ's decision, she was approximately 5'2" and weighed 230 pounds. (R. 33). Ms. Embry has an 11th grade education, but did not graduate from high school or earn a GED, and has no vocational or specialized training. (R. 34, 156). From 2002 until 2009, Ms. Embry worked as photo specialist for Walgreens. (R. 159, 163). She was on her feet all day, and lifted and carried 20-25 pounds. (R. 164). She also worked as a sewing machine operator from 1998 to 2000, and most recently as a team leader at a department store for the month of December 2009. (R. 157).

### B.
### The Medical Evidence

On August 13, 2008, Ms. Embry sought treatment after experiencing left-side tingling and numbness for about a week. (R. 260). The numbness progressed up to her face, but there was no pain, weakness, slurred speech, double vision, or difficulty swallowing. (R. 260). Ms. Embry also reported she got headaches that felt like pressure on the top of her head, probably

related to her hypertension. (R. 260). She had no symptoms at her examination, however, and physical exam was essentially normal – strength, motor function, sensation, and cerebral exam – with the exception of reflexes, which were diminished bilaterally. (R. 260). ECG was normal. (R. 261-62). Ms. Embry was placed on aspirin, and sent for an MRI.

An MRI performed on November 3, 2008 revealed areas that were suspicious for damage to the myelin sheath that surrounds central nervous system axions. Multiple sclerosis was possible, but other causes could not be ruled out. (R. 259).

On April 27, 2009, Ms. Embry was unable to move her left side when she woke up. She was able to bear weight but kept falling. She went to the hospital on May 4, 2009. (R. 319, 326).

A May 7, 2008, a physical therapy report stated that Ms. Embry had suffered a transient ischemic attack in November 2008, but that Ms. Embry demonstrated safety and independence with functional mobility. She had some mild gait deviations and left side weakness. (R. 306). Upon examination, Ms. Embry denied suffering any symptoms. (R. 307). Motor strength was 4+ or 5 out of 5 in all extremities. Neurological signs were essentially normal with the exception of a positive left side Hoffman's sign. (R. 308, 313-15).

An examination on May 7, 2009, revealed intact cranial nerve function, normal sensation, but some weakness and drift in the left arm. (R. 419). On May 8, 2009, Ms. Embry had an ECG. Left ventricle function was normal. Ejection fraction was 55% to 65%. There were no regional wall motion abnormalities. (R. 297). An angiogram on May 9th revealed some compromise of the right internal carotid artery. (R. 301-02). A couple of days later, Ms. Embry had a brain CT. It revealed a large perfusion defect and decreased cerebral blood flow and cerebral blood volume. The focal region of the infarct in the high right frontal lobe

corresponded to the area of damage revealed in the MRI. (R. 295-96). Ms. Embry had a normal sleep study on June 4, 2009. (R. 285-86).

On April 30, 2010, Dr. Mohamed reported on Ms. Embry's condition as part of her disability application process. (R. 370-75). He noted her mental status was normal aside from minimally impaired memory and thought process. She had some right side facial weakness. (R. 370). Her strength was normal throughout except for her left hand and fingers, which were 4/5. Coordination was normal. (R. 371-72). Gait was normal, but minimally slowed. (R. 373). She had mild difficulty picking up small objects and tying laces with her left hand. (R. 374).

In June 2010, Ms. Embry underwent an EDAS procedure. (R. 400-01, 408-09). She tolerated it well. (R. 403). After physical therapy evaluation she was discharged. She was told not to lift more than 5-10 for the next 3-4 weeks, ambulate carefully with full weight bearing. (R. 404).

Dr. Alexander Panagos conducted a consultative physical exam on October 13, 2010. Ms. Embry reported that she had suffered five TIAs so far that year and a cerebral vascular accident in May. She underwent a right-side craniotomy, had an uneventful recovery and was undergoing physical therapy. She complained of blurred vision, weakness and numbness in her left arm, and difficulty holding objects for a long time. (R. 448). She could lift no more than three pounds. She had chronic headaches daily, 9/10 in severity, lasting two hours, and resolved with Ibuprofen. Examination revealed corrected vision as 20/25 on the right, 20/30 on the left. (R. 449). There was no edema in her extremities. She had a full range of motion and her gait was normal. Left hand grip strength was 4/5. There were no problems with fine or gross motor movements. Range of motion was normal in all joints. (R. 450). Reflexes and sensation were normal; motor strength was normal aside from it being 4/5 in the left arm. (R. 450-51).

Ms. Embry also saw Dr. Henry Fine for a consultative psychological exam that same day. Ms. Embry related her history of several CVAs and one larger CVA. At that point, she was depressed for about six weeks, but then returned to normal. But she was clearly depressed at the exam. She said her memory was impaired. (R. 444). Upon examination, her immediate recall was intact, but her five minute recall was impaired. She had only vague recollections of recent events such as dinner last night en route to the exam. She claimed not to know any cities besides Chicago and "Webster". She had difficulty performing simple calculations. (R. 445). Diagnosis was depression secondary to her medical condition. (R. 446).

On October 26, 2010, psychologist Phyllis Brister reviewed the medical evidence on behalf of the disability agency. She found Ms. Embry had mild restrictions in her activities of daily living and social functioning, and moderate difficulties in concentration, persistence, and pace. (R. 462). There were moderate limitations noted in the areas of: understanding and remembering detailed instructions, carrying out detailed instructions, working around others. (R. 466-67). Dr. Brister felt Ms. Embry had the capacity to understand, recall , and execute simple, routine, repetitive operations and was capable of performing simple work. (R. 468). On November 1, 2010, Dr. Bharati Jhavari reviewed the record and affirmed the RFC of May 11, 2010. (R. 470-72).

On November 18, 2010, Ms. Embry saw Dr. Mohamed. She had some right side facial numbness, but no other new symptoms. She had +1 pitting edema in her legs. She had a minimal impairment in recall and remote memory, and mild difficulty with calculation. Strength was 5/5 in all extremities. Sensation was normal. Gait was normal but slow. There was still mild decreased rapid repetitive movement in the mildly impaired fine motor movement in the left hand. (R. 475).

On December 7, 2010, Ms. Embry sought treatment after blacking out and falling down a flight of stairs. (R. 522, 524). She was still able to walk and was taking Motrin for pain. (R. 522). There was no indication of major or minor depression and her functionality was not impaired. (R. 522-23). She had decreased strength in her left extremities. (R. 524). Neurological exam was essentially normal, although reflexes were somewhat decreased on the right side. (R. 524).

Ms. Embry had an angiogram on January 11, 2011, to follow up on her EDAS procedure. (R. 502). It revealed very good flow into the middle cerebral artery territory, but the presence of Moyamoya pattern on the left side that would also likely require re-vascularization. (R. 502-03).

On February 21, 2011, Ms. Embry went to the hospital, thinking she was having a stroke. EEG was normal, and stroke scale was negative aside from left upper extremity weakness. (R. 493). It turned out to be a viral infection. (R. 493, 496, 499, 511). Again, her left extremities were a bit weaker than her right; 4+ compared to 5. (R. 512). She had some +1 pitting edema. (R. 512). The results of her right hemisphere surgery looked good, and she was thinking about having the left hemisphere done. (R. 511).

## C.
### The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At her hearing, Ms. Embry claimed she has been disabled since September 30, 2009. (R. 35). Nevertheless, she was receiving unemployment insurance. (R. 34). She said she could walk a block with her cane, which she had been using for 7 months. (R. 36-37). She can stand for just 10-20 minutes, but had no problem sitting if she got up every 20 minutes to relieve numbness in her legs. (R. 37) She could lift a gallon of milk and a bag of groceries, but had

some difficulty going up stairs. (R. 37).  She had to use her cane.  (R. 37).  She was able to climb the stairs to leave her basement apartment every day.  (R. 38).  She is right-handed and she had no problems with that hand, but said she had difficulty reaching overhead with her left, non-dominant hand. (R. 33, 38).  She could grasp things with her left hand.  (R. 38).

Ms. Embry testified that she lived with her three children in a basement apartment.  She woke them up every day to get them ready for school, helped with homework, and was able to prepare sandwiches or microwave dinners, dust, and take out the garbage. (R. 37, 39-40).  Her daughter did the laundry and made the beds.  (R. 40).  Ms. Embry explained that she had issues buttoning buttons, cannot do dishes or drive due to her left arm, and her daughter does the laundry and helps her with grocery shopping. (R. 39, 44). She attended church, her daughter's track meets, and banquets. (R. 41).  She watched television, used her cell phone, and went on Facebook once a week, but sometimes had problems concentrating. (R. 41, 45).

Ms. Embry suffers from headaches everyday that are relieved an hour after taking Ibuprofen (R. 36) She also suffers from swelling in her legs that is alleviated when she elevates them at night. (R. 36). She experiences tingling, numbness, and weakness on her left side and has problems with the use of her left hand and has difficulty reaching overhead with her left arm, but can try to reach in front with her left arm and can hold things. (R. 38). She has no problems with her right arm or hand. (R. 43-44, 38). Ms. Embry has some memory issues and on one occasion forgot to pick up her daughter from day care. (R. 45). She also has problems sleeping. (R. 47).

## 2.
## The Vocational Expert's Testimony

Ms. Leanne L.Kehr testified as a vocational expert (VE). She testified that Ms. Embry had previously worked as a photo clerk, which would be light work per the Dictionary of Occupational Titles (DOT) and was considered unskilled work with an SVP of 2. (R. 48).

The ALJ posed two hypotheticals concerning an individual of the same age, education and work experience as Ms. Embry, who could lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand/walk for up to two hours during an eight-hour work day, sit at least six of those hours and use a cane as needed. First, the ALJ asked whether that individual could perform any jobs when they could use the left, non-dominant hand frequently to handle, finger and feel, and reach overhead with that left hand frequently and was limited to 2 to 3 step simple, routine tasks. (R. 49). The VE testified that such an individual would be precluded from Ms. Embry's past work but would be able to do sedentary work such as order clerk (7500 jobs in the area), sorting work (3000 jobs), or account clerk (3300 jobs). (R. 49).

Secondly, the ALJ asked whether there were jobs for an individual who could use the non-dominant left upper extremity to reach overhead occasionally to handle, finger, and feel. The VE responded that such an individual would still qualify for sedentary positions such as an order clerk or account clerk. (R. 50). The ALJ then followed up with questions about an individual who could only be on task 20% of the work day or whom had to miss two work days a month, to which the VE responded that all competitive employment would be precluded on both counts. (R. 50).

Ms. Embry's attorney followed up on the ALJ's first hypothetical by changing the word occasionally in being able to reach overhead to handle, finger and feel, to the rarely, meaning between zero and fifty percent of the day. (R. 51). The VE testified that such restrictions would

be allowable in the clerk jobs she mentioned. (R. 51). The attorney then asked the result if the individual could walk or stand for, at most an hour and a half of the eight hour work day. The VE responded that such restraints would preclude work. (R. 51). Lastly, the attorney hypothesized whether work exists if the individual had to elevate her legs at least waist level during the work day for at least ten minutes every hour. (R. 52). The VE concluded that such restrictions would preclude work. The ALJ followed up, by asking whether work would exist if the individual had to stand for one or two after sitting for 45 minutes and the VE found that such a restriction would not restrict all work. (R. 52)

### III.
### The ALJ's Decision

The ALJ conducted a five-step analysis to determine whether Ms. Embry was disabled. The ALJ reviewed the medical evidence and found that Ms. Embry had five severe impairments including: hypertension with a history of infarct and craniotomy, Moyamoya disease, obesity, headaches and depression. (R. 18). However, the ALJ determined that Ms. Embry's severe impairments failed to meet or medically equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). Specifically, they failed to meet the relevant criteria under Section 11.00 and Section 12.04. (R. 19). The ALJ then went on to determined that Ms. Embry retained the capacity to performed sedentary work with the additional limitations of not being able to use her non-dominant left hand frequently to reach overhead to feel, finger, and handle; not being able to work around hazards like unprotected heights or moving machinery; and being limited to simple, one or two step, repetitive jobs. The ALJ then relied on the VE's testimony to find that, considering Ms. Embry's age, education, work experience, and residual functional capacity for a restricted range of sedentary work, she retained the capacity to perform a

significant number of jobs in the regional economy.  (R. 24).  Therefore, the ALJ concluded that

Ms. Embry was not disabled under the Act.

## IV.
## DISCUSSION

### A.
### The Standard of Review

We review the ALJ's decision deferentially and will not replace the ALJ's judgment with

our own. *Weathered v. Astrue*, 649 F.3d 565, 568 (7th Cir.2011). Our analysis focuses on whether

the ALJ's determination was supported by substantial evidence, comprising such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971)(substantial evidence is "more than a mere scintilla. It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.");

*Pepper v. Calvin*, 712 F.3d 351, 361 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th

Cir. 2012).

In rendering a decision, an ALJ "must build a logical bridge from the evidence to his

conclusion, but he need not provide a complete written evaluation of every piece of testimony

and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005).  It is enough if the ALJ

"minimally articulate[s] his or her justification for rejecting or accepting scientific evidence of

disability." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001).  The Seventh Circuit has

repeatedly assured that the standard is a "lax" one.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.

2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008).

The ALJ's decision must enable a reviewing court to give the claimant a meaningful

judicial review. *Hopgood ex rel. L.G. v.* Astrue, 578 F.3d 696, 698 (7th Cir. 2009). This has been

called building a "logical bridge" between the ALJ's evidence and their ultimate decision.

*Sarchet v.* Charter, 78 F.3d 305, 307 (7th Cir. 1996). The Seventh Circuit has called it a "lax" requirement. *Elder v.* Astrue, 529 F.3d 408, 415 (7th Cir. 2008).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether an individual is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals of one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe,* 425 F. 3d at 352, *Stein v.* Sullivan, 892 F.2d43, 44 (7th Cir. 1990). A negative answer ends the inquiry, and result in a finding that the claimant is not disabled, at any step other than Step 3. 20 C.F.R. § 404.1520; Stein, 892 F.2d at 44. The burden of proof falls on the claimant for Steps 1 through 4 and if met, the burden then shifts to the Commissioner for the ultimate step. Briscoe, 425 F.3d at 352, *Brewer v. Chater*, 103 F. 3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Ms. Embry takes issue with several aspects of the ALJ's decision, but essentially, this is a case about the ALJ's credibility determination and the Seventh Circuit's logical bridge requirement. For example, at step three, the ALJ determined that Ms. Embry did not have an impairment or combination of impairments that met one of the listed impairments. The ALJ provided a rather cursory analysis – she didn't even specify what neurological listing she was considering, and based her conclusions in large part on her disbelief of Ms. Embry's complaints.

The listings are a catalog of medical impairments and accompanying signs and findings; if a claimant meets or medically equals one of the listings she is presumed disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 404.1520(d). The claimant has the burden of showing that her impairments meet a listing, and she must show that his impairments satisfy all of the various criteria specified in the listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). But, an ALJ must mention the specific listings she is considering and her failure to do so, if combined with a "perfunctory analysis," may require a remand. *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012); *cf. Ribaudo*, 458 F.3d at 583 (ALJ "should" mention specific listing). Here, the ALJ failed to mention the specific listing she was considering, but merely adverted to the entire section 11.00 for neurological impairments. That section includes *nineteen* separate listings with myriad criteria.

The failure to mention the specific listing does not necessarily require a remand. From the ALJ's brief analysis, it would appear that she had in mind only listing 11.04, which covers central nervous system vascular accidents. However, that is information that shouldn't have to be supplied by the reviewing court or the Commissioner's attorneys. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Shauger v. Astrue*, 675 F.3d 690, 695-96 (7th Cir. 2012). But, in

any event, to meet listing 11.04, there must be one of the following more than three months after the event:

> A. Sensory or motor aphasia resulting in ineffective speech or communication; or

> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

20 CFR Pt. 404, Subpt. P, App. 1, §11.04. The ALJ said the medical evidence did not substantiate that Ms. Embry's impairments resulted in an inability to ambulate, perform gross movements effectively, or extreme loss of function in both upper and lower extremities.

The ALJ noted that Ms. Embry could walk at a reasonable pace, perform fine and gross manipulations, and effectively speak and communicate. (R. 19). The ALJ did not cite to any specific records at this point in her opinion; two pages later she summarized the record, noting findings repeatedly demonstrating a normal but slow gait and mild limitations in the left hand. (R. 21). The finding regarding Ms. Embry's gait is a bit suspect because later, the ALJ says that Ms. Embry needs a cane to ambulate effectively. (R. 22). And Ms. Embry's own testimony describes greater limitations in her mobility and the use of her left arm.

So the ALJ's step three determination was necessarily interwoven with her assessment of Ms. Embry's credibility, as was, indeed, her residual functional capacity finding. The ALJ found that Ms. Embry was not entirely credible based on the medical evidence, her daily activities, and how she sought relief of her headaches and edema. (R. 22). The medical evidence was certainly significant to the ALJ's determinations. In the main, despite Ms. Embry having a rather frightening condition that puts her at risk for repeated TIAs and CVAs, her doctors have not recorded terribly dire residual effects. In the main, she has presented with some mild limitations in strength and motor function in her left extremities. The medical evidence

would certainly seem to undermine, or at least call into some question, Ms. Embry's credibility. But, in the Seventh Circuit, that is not enough – not always, anyway.

First, while the Seventh Circuit has ruled time and again that a claimant's credibility may be undermined by the objective medical evidence, *see, e.g., Pepper,* 712 F.3d at 368; *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), the court has also ruled that an ALJ may not disregard a claimant's complaints of pain simply because they are belied by the objective medical evidence. *See, e.g., Moore v. Colvin,* 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Perhaps these rulings might be harmonized by taking the court to mean that the ALJ can point to the medical record as undermining a claimant's testimony only when the ALJ provides additional reason for doubting it. Still, the court has seemingly upheld credibility determinations based solely on the objective medical evidence on a number of occasions. *See, e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 896 (7th Cir. 2011); *Getch*, 539 F.3d at 483; *Adkins v. Astrue*, 226 Fed.Appx. 600, 606 (7th Cir. 2007); *Sienkiewicz*, 409 F.3d at 804. As already noted, in this instance, the ALJ did not rely solely on the medical evidence to find Ms. Embry's testimony not credible. So, given what appears to be Seventh Circuit precedent, the issue here is the validity of the rest of her reasoning.

As already noted, one of the factors the ALJ relied upon was Ms. Embry's daily activities. An ALJ's consideration of a claimant's daily activities – while required – is often fraught with peril. While the Seventh Circuit has acknowledged that it is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility, it has repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time. *See, e.g.*

*Roddy v. Astrue*, 705 F.3d 631, 639 (7ᵗʰ Cir. 2013); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir.2011); *Moss v. Astrue*, 555 F.3d 556, 562 (7ᵗʰ Cir.2009); *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir.2005); *but see, e.g., Jones v. Astrue*, 623 F.3d 1155, 1162 (7ᵗʰ Cir. 2010)(court refused to overturn ALJ's credibility determination even where claimant's ability to do chores was limited); *Flint v. Colvin*, 543 Fed.Appx. 598, 600 (7ᵗʰ Cir. 2013)(ALJ's credibility determination upheld even though plaintiff could only perform "some" chores and had to care for her husband who was a stroke victim).

Ms. Embry's activities were certainly limited in this case. In discussing them, the ALJ took great license. She said Ms. Embry could prepare meals. (R. 22). True, after a fashion, but Ms. Embry said she was limited to making sandwiches and heating frozen dinners in the microwave because she could not stand long. (R. 39, 173). The ALJ also said Ms. Embry did the shopping. (R. 22). She did, but only every two weeks, and she needed help from her daughter. (R. 39, 174). The ALJ added that Ms. Embry dusted, did the laundry, and took out the garbage. (R. 22). Ms. Embry said that she needed help with laundry, cleaning, and mopping. (R. 39-40, 173).

In addition, the ALJ said she could handle her personal care, but neglected to mention that Ms. Embry needed help dressing and with her hair. (R. 39, 172-73). She also neglected to mention that Ms. Embry could not concentrate well enough to read or, at times, even to follow TV shows. (R. 41, 45). And, finally, the ALJ mischaracterized Ms. Embry's testimony regarding her sleep. The ALJ said she testified inconsistently, saying she got five hours of sleep at one point and just one or two at another. (R. 22). Actually, Ms. Embry testified consistently that she got five hours of sleep a night. (R. 39, 47). She said she had to sleep two hours *during the day* due to fatigue. (R. 45).

Then there was the ALJ's mention that Ms. Embry had visitors at her home, thereby demonstrating she engaged in social activities. This is nonsense. A bedridden invalid could have visitors. That would not mean she could work full time. It must be said, then that the ALJ's analysis of Ms. Embry's daily activities was inappropriate.

The ALJ also noted that although Ms. Embry claimed her headaches did not improve after her surgery, she said they were relieved with over-the-counter medication. (R. 22). It's not clear whether the ALJ thought she was lying about the surgery not curing her headaches or that she was exaggerating about their severity. Ms. Embry did testify that she suffered repeated, daily headaches both before and after surgery. And she did say that they lasted about two hours and were relieved with Ibuprofen. (R. 36). Her testimony is neither inherently incredible nor suspicious. And certainly repeated, daily headaches, whether or not they subside in two hours with medication, would seem to have a detrimental effect on concentration, if nothing else.

Finally, the ALJ concluded that Ms. Embry "collected unemployment and *admitted* looking for work during that time because she needed funds." (R. 22)(Emphasis supplied). Not surprisingly, the ALJ found that Ms. Embry was not disabled. This conclusion, however, is based on a significant misapprehension of what Ms. Embry actually said:

ALJ: Are you still receiving unemployment compensation?

Ms. Embry: Yes, ma'am.

ALJ: What are you doing to look for work because to get unemployment you have to certify you're looking for a job? How are you going about doing that?

Ms. Embry: *I'm not looking for a job. I just needed the money for my unemployment to take care of my kids because I got put out of my apartment.*

ALJ: So you're not going online to look for a job or looking at newspaper ads or anything like that?

Ms. Embry: *No, ma'am.*

(R. 34-35)(Emphasis supplied).

So, the takeaway from the testimony should have been that Ms. Embry deceived those responsible for awarding unemployment compensation. Or that she was lying at the hearing. That would have warranted the ALJ questioning Ms. Embry's credibility. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)(ALJs may rely on the ability-to-work certification as "one of many factors adversely impacting [the claimant's] credibility."). This is so even where the claimant certifies her ability to work out of desperation for funds. *Lott v. Colvin*, 541 Fed.Appx. 702, 707 (7th Cir. 2013).[1] But that's not what she did. Instead, she incorrectly concluded that Ms. Embry "admitted" looking for work and therefore her hearing testimony that she could not work had to be rejected.

Overall, then, the combination of the ALJ's credibility analysis, based on her interpretation of Ms. Embry's testimony, and her failures to build a logical bridge from the evidence to her conclusions necessitate a remand of this case. That is not to say that the ALJ's ultimate conclusion was wrong. While the medical evidence confirms Ms. Embry is suffering from a rather disconcerting condition, it does not show that her physical and mental capacities are significantly limited by it. Any impairments mentioned by her treating doctors – in her gait, use of her left arm, memory – are invariably termed "mild." And her claimed deception of the unemployment authorities is a significant matter that can and should properly factor into the credibility analysis. But, "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet*, 78 F.3d at 307. Nor can we affirm a

---

[1] Even a false certification would not alone "necessarily mean [the claimant] is not disabled." *Richards v. Astrue*, 370 Fed.Appx. 727, 732 (7th Cir. 2010).

decision in which an adverse credibility determination of the claimant is based on a misapprehension of that testimony.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. # 26] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. # 34] is DENIED.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 5/27/14